Richard W. Hughes (NM Bar No. 1230)
Reed C. Bienvenu (NM Bar No. 147363)
Rothstein Donatelli LLP
P.O. Box 8180; 1215 Paseo De Peralta
Santa Fe, New Mexico 87504
Tel: 505-988-8004
rwhughes@rothsteinlaw.com
rbienvenu@rothsteinlaw.com
*Pro Hac Vice* Applicants

Margaret J. Vick (AZ Bar No. 9330)
Margaret J. Vick, PLC
140 E. Rio Salado Pkwy #607
Tempe, AZ 85281
Tel: 602-814-7666
margaret.vick@mvicklaw.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| HAVASUPAI TRIBE,<br><br>       Plaintiff,<br><br>v.<br><br>ANASAZI WATER CO., L.L.C., CATARACT NATURAL RESERVE LAND, LLC, CITY OF WILLIAMS, WILLIAM COLLINS, WILLIAM & LORRAINE COLLINS FAMILY TRUST, GRAND CANYON EQUIPMENT, INC., ENERGY FUELS RESOURCES (USA) INC., EFR ARIZONA STRIP LLC, HALVORSON-SEIBOLD, INC., HYDRO-RESOURCES, INC., JENTRI LLC, LURE MAKER, LLC, PERNELL MCGUIRE, MCGUIRE INVESTMENTS LLC, ALVIN J. REED, CHRISTINE G. REED, SQUIRE MOTOR INNS, INC., RANDY TOPEL, TOPEL PROPERTIES LLC,<br><br>       Defendants. | **COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**<br><br>Civil Action No. |

Plaintiff, the Havasupai Tribe (the "Havasupai" or "Tribe"), by and through their undersigned attorneys, bring this action against Anasazi Water Co., L.L.C., Cataract Natural Reserve Land, LLC, City of Williams, William Collins, William & Lorraine Collins Family Trust, Grand Canyon Equipment, Inc., Energy Fuels Resources (USA) Inc., EFR Arizona Strip LLC, Halvorson-Seibold, Inc., Hydro-Resources, Inc., Jentri LLC, Lure Maker, LLC, Pernell McGuire, McGuire Investments LLC, Alvin J. Reed, Christine G. Reed, Squire Motor Inns, Inc., Randy Topel, Topel Properties LLC (collectively, "Defendants"), and allege as follows:

## I. INTRODUCTION

1. The Havasupai, a federally-recognized Indian tribe, reside along the banks of Havasu Creek, deep in Havasu Canyon, a tributary of the Colorado River in the Grand Canyon, as they have since time immemorial. The Tribe depends upon the water in the creek, and other seeps and springs on its lands, for its livelihood and continued existence. These waters provide the Tribe's drinking water; they are the source of the Tribe's domestic and municipal water supply; they irrigate the Tribe's fields and provide water for its livestock; and they play a central role in the traditions, religion and culture of the Tribe. Havasu Creek, with its many spectacular waterfalls, is a site of unparalleled natural beauty that draws numerous visitors to the Tribe's reservation each year. These visitors make up an important part of the Tribe's local economy. The waters of Havasu Creek are also an essential part of the identity, history, and culture of the Havasupai. In its own language, the Tribe is known as the Havasuw 'Baaja, which means the People of the Blue Green Waters.

2. In recent years, however, the Tribe's waters have become increasingly threatened by a growing number of groundwater wells on the Coconino Plateau that draw from the aquifer that is the source of the seeps and springs on the Tribe's reservation and of Havasu Creek itself. Uranium mines, theme parks, tourist stops, resorts, commercial enterprises, private developments, ranches, municipalities, and others have been drilling wells into this aquifer to support their ever-growing demands for water. These wells will reduce the flow of the waters on the Havasupai's lands, thereby jeopardizing the Tribe's sole water supply and its cultural identity. These wells also threaten the plants and wildlife on the Tribe's lands and in the Grand Canyon National Park, which depend upon the continued full flow of the Havasu Creek and the springs and seeps that are fed by the same aquifer.

3. The Havasupai bring this action to protect their waters from this present and growing threat. The Tribe possesses aboriginal and federally-reserved water rights to the full flow of the creek, springs, seeps, and streams on its lands. These rights derive from the Tribe's historical use of this water and from the federal government's creation and expansion of the Tribe's reservation. The Defendants in this action are the owners of groundwater wells that draw water from the aquifer that is the source of the Tribe's waters. The Defendants' withdrawal of water from the aquifer constitutes a trespassory and unlawful interference with the Tribe's water rights, that threatens irreparable harm to the Tribe's livelihood and its traditional and cultural interests, and the Tribe seeks declaratory relief as to the character and extent of its rights, and injunctive relief against any withdrawal of water that would reduce the flow of the Havasupai's waters.

## II.     JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1362 because this is a civil action brought by an Indian tribe arising under the Constitution, laws, or treaties of the United States.

5.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because this is the judicial district in which the defendants reside, in which the events or omissions giving rise to the claims occurred, and in which the property that is the subject of the action is situated.

## III.    PARTIES

6.      Plaintiff Havasupai Tribe is a federally-recognized Indian tribe whose main village, Supai, is located in Havasu Canyon (previously, often called Cataract Canyon), a side canyon of the Grand Canyon. The Tribe has lived in the Grand Canyon in north-central Arizona for more than a thousand years. The Tribe's current reservation comprises approximately 188,077 acres, including essentially the entirety of Havasu Canyon from Sinyella Springs on the south to the boundary of Grand Canyon National Park at Beaver Falls on the north, and the plateaus on either side of Havasu Canyon. In addition, over 95,000 acres within Grand Canyon National Park have been designated as a permanent traditional use area of the Tribe. The Havasupai Tribe has 742 members, 542 of whom live on the reservation in the Village of Supai, which is the only town on the reservation. Supai is accessible only by helicopter or by foot, horse, or mule via an eight mile trail into the canyon.

7.      Defendant Anasazi Water Co., L.L.C. ("Anasazi") is the owner of a groundwater well in Coconino County that draws from the Redwall-Muav aquifer (the "R-aquifer"), that is registered with the Arizona Department of Water Resources

("ADWR") under registration number ("Reg. No.") 55-560179. The well is located in Coconino County on Parcel Number ("Parcel No.") 502-17-003B. Anasazi is a domestic limited liability company with an address of 620 West Meade, Williams, AZ 86046.

8. Defendant Cataract Natural Reserve Land, LLC ("CNRL") is the owner of a groundwater well in Coconino County that draws from the R-aquifer (Reg. No. 55-613915, Parcel No. 700-28-003). CNRL is a domestic limited liability company with an address of 113 N. San Francisco #212, Flagstaff, AZ 86001.

9. Defendant City of Williams (the "City of Williams") is the owner of three groundwater wells in Coconino County that draw from the R-aquifer (Reg. No. 55-597241, Parcel No. 204-12-001J; Reg. No. 55-576327, Parcel No. 201-41-002; and Reg. No. 55-584106, Parcel No. 200-12-003B). The City of Williams is also in the process of completing a fourth well in Coconino County, called the "Sweetwater Well," which will draw from the R-aquifer (Reg. No. 55-224424, Parcel No. 200-09-006A). The City of Williams is a municipality with an address of 113 S. 1st St. Williams, AZ 86046.

10. Defendants William Collins ("Collins"), William & Lorraine Collins Family Trust ("Collins Trust"), and Grand Canyon Equipment, Inc. ("Grand Canyon Equipment") are the owners of two groundwater wells in Coconino County that draw from the R-aquifer (Reg. No. 55-545765, Parcel No. 503-34-007; Reg. No. 55-914939, Parcel No. 503-14-073). Collins is an individual with the address 317 S. State Rte. 64, Williams, AZ 86046. Collins Trust is a trust entity with an address of 317 S. State Rte. 64, Williams, AZ 86046. Grand Canyon Equipment, Inc. is a domestic corporation, also with the address of 317 S. State Rte. 64, Williams, AZ 86046.

11. Defendants Energy Fuels Resources (USA) Inc. and EFR Arizona Strip LLC (collectively, "EFR") are the owners of a groundwater well that draws from the R-aquifer (Reg. No. 55-515772). The well is located at the Canyon Uranium Mine in the Kaibab National Forest, which is owned and operated by EFR. EFR is also planning to drill a groundwater well that draws from the R-aquifer at the site of the Wate Uranium Mine on Arizona state trust land. Energy Fuels Resources (USA) Inc. is a Delaware corporation. EFR Arizona Strip LLC is a Colorado limited liability company whose address is 225 Union Blvd. Ste. 600, Lakewood, CO 80228.

12. Defendants Halvorson-Seibold, Inc. ("Halvorson-Seibold") and Hydro-Resources, Inc. ("Hydro Resources") are the owners of three groundwater wells in Coconino County that draw from the R-aquifer (Reg. No. 55-542928, Parcel No. 502-17-010C; Reg. No. 55-543573, Parcel No. 503-01-020V; Reg. No. 55-910854, Parcel No. 503-35-002A). Halvorson-Seibold is a domestic corporation with an address of 568 Airport Road, Grand Canyon, AZ 86023. Hydro Resources is a domestic corporation with an address of P.O. Box 3246, Grand Canyon, AZ 86023.

13. Defendant Jentri LLC ("Jentri") is the owner of a groundwater well in Coconino County that draws from the R-aquifer (Reg. No. 55-916881, Parcel No. 202-14-001A). Jentri is a domestic limited liability company with an address of 1500 E. Rt. 66, Williams, AZ 86046.

14. Defendant Lure Maker, LLC. ("Lure Maker") is the owner of a groundwater well in Coconino County that draws from the R-aquifer (Reg. No. 55-601192, Parcel No. 503-13-002B). Lure Maker is a domestic limited liability company with an address of 2155 W Pinnacle Peak Rd. #201, Phoenix, AZ 85027.

15. Defendants Pernell McGuire and McGuire Investments LLC (collectively, "McGuire") are the owners of a groundwater well in Coconino County that draws from the R-aquifer (Reg. No. 55-916846, Parcel No. 502-24-031B). Pernell McGuire is an individual with an address of 2588 N. Grey Fox Way, Flagstaff, AZ 86001. McGuire Investments LLC is a domestic limited liability company with an address of 320 N. LeRoux, Suite A, Flagstaff, AZ 86001.

16. Defendants Alvin J. Reed and Christine G. Reed (collectively, the "Reeds") are the owners of a groundwater well that draws from the R-aquifer (Reg. No. 55-590559). The well is located in Yavapai County on Parcel No. 302-16-002B. The Reeds are individuals with an address of P.O. Box 1, Ash Fork, AZ 86320.

17. Defendant Squire Motor Inns, Inc. ("Squire Motor Inns") is the owner of a groundwater well in Coconino County that draws from the R-aquifer (Reg. No. 55-523284, Parcel No. 502-17-008A). Squire Motor Inns is a Washington corporation with a domestic address of P.O. Box 130, Grand Canyon, AZ 86023.

18. Defendants Randy Topel and Topel Properties LLC ("Topel Properties") are the owners of a groundwater well in Coconino County that draws from the R-aquifer (Reg. No. 55-557724, Parcel No. 203-23-001D). Randy Topel is an individual with an address of 7279 Jolly Rogue Lane, Williams, AZ 86046. Topel Properties is a domestic limited liability company with an address of 6975 E. Wildcat Dr., Scottsdale, AZ 85262.

19. Each of the Defendants' wells, as identified in paragraphs 7 to 18, above, takes water that would otherwise travel underground to emerge on the Havasupai reservation or in the Grand Canyon National Park, thereby infringing on the Havasupai's rights, as is explained in greater detail below.

## IV. THE HAVASUPAI AND THEIR RESERVATION

20.     The Havasupai have resided in the Grand Canyon in north-central Arizona continuously from time immemorial. The Tribe's traditional homeland encompassed nearly the entire Coconino Plateau. In 1968, the Indian Claims Commission determined that the Tribe's aboriginal area, which had been exclusively used and occupied by the Tribe, generally extended from the Colorado River on the north to the Bill Williams Mountains on the south, and from the Little Colorado River on the east to the Aubrey Cliffs and the plateaus around Havasu Creek on the west. *Havasupai Tribe v. United States*, 20 Ind. Cl. Comm. 210 (1968).

21.     Throughout the Tribe's history, the Tribe has depended upon and made full use of the scarce water resources in this region, but especially the waters of Havasu Creek and the springs and seeps in the canyon. Traditionally, during the summer months, the Tribe resided in Havasu Canyon, irrigating crops using water from Havasu Creek, as well as in the area currently known as Indian Gardens, irrigating crops using water from Indian Gardens Spring. In the winter, the Tribe moved to the plateau to hunt, gather wild plants for food, and graze livestock. Water has always been an important part of the identity and culture of the Tribe, as is reflected in the Tribe's name: the Havasuw 'Baaja, which means the People of the Blue Green Waters.

22.     In the late 1800s and early 1900s, the Tribe's way of life was disrupted by American expansion into the Southwest. The aboriginal lands of the Havasupai were encroached upon by railroads, miners, and ranchers, as well as by Congress's establishment of the Grand Canyon National Park and the Kaibab National Forest.

23.     The Havasupai Reservation was originally established on June 8, 1880, by Executive Order. The original reservation was supposed to encompass

approximately 38,000 acres, including the springs that supply Havasu Creek and the downstream waterfalls. However, this original Executive Order contained an error regarding the north and south descriptions. This error was corrected in a subsequent Executive Order dated November 23, 1880.

24. On March 3, 1882, a new Executive Order greatly restricted the boundaries of the Tribe's reservation to only those lands that were accessible to a federal surveyor of the 1880 Executive Order reservation. The 1882 Executive Order reduced the reservation to only 518.6 acres, on the floor of the canyon. While the Tribe continued to live and farm on this reservation, it also continued to use and occupy a much larger area, including the canyon and the traditional plateau areas within the Tribe's aboriginal territory, for purposes including hunting, grazing, and farming and traditional cultural activities and purposes.

25. The 1919 Act establishing the Grand Canyon National Park recognized the Tribe's reservation and also provided a mechanism for tribal members to continue "to use and occupy other tracts of land within [the Grand Canyon National Park] for agricultural purposes." 40 Stat. 1175 (1919). The Tribe also continued to use lands within what became Kaibab National Forest through grazing permits.

26. On March 4, 1944, an Act of Congress set aside an additional 2,560 acres for the Tribe in a non-contiguous parcel in Cataract Canyon (as Havasu Canyon was then known), to protect access to the springs commonly known as Sinyella Springs. P.L. 78-246. This Act resolved a longstanding conflict between the Tribe and a lessee of state land over the Tribe's access to and ability to water livestock and perform traditional ceremonies at the springs.

27. In 1975, Congress added 185,000 acres to the Havasupai Reservation as part of the Grand Canyon National Park Enlargement Act. P.L. 93-620 (codified at 16 U.S.C. §§ 221-228j, as amended) (the "1975 Act"). Today, the Havasupai Reservation comprises approximately 188,077 acres, embracing virtually all of Havasu Canyon upstream of the national park boundary and much of the surrounding plateaus. The 1975 Act also designated over 95,000 acres within the Grand Canyon National Park as a permanent traditional use area of the Tribe (the "Traditional Use Area"). The 1975 Act also maintained Tribal members' access "to any sacred or religious places, burial grounds, native foods, paints, materials, and medicines located on public lands not otherwise covered in this Act." 16 U.S.C. § 228i.

## V. THE HAVASUPAI'S WATERS AND WATER USE

28. The only significant surface water on the Havasupai reservation is Havasu Creek, including the springs and seeps that feed it. Havasu Creek flows through Supai, and joins the Colorado River in Grand Canyon National Park. There are numerous cascades and waterfalls along Havasu Creek, but especially including Navajo Falls, Havasu Falls, Mooney Falls, and Beaver Falls.

29. The principal source of Havasu Creek is Havasu Springs, which is a group of possibly hundreds of seeps and springs within Havasu Canyon whose waters merge together to form the creek. The Havasu Springs are among the most culturally significant springs to the Havasupai, and are the largest spring complex on the reservation. Another significant source of water for Havasu Creek is the West Wall Spring.

30. In addition to Havasu Springs and the West Wall Spring, there are numerous other seeps and springs on the Havasupai reservation. Nearly fifty springs

10

have been identified on Havasupai lands, including Greasy Spring, Manakaja Spring, Tenakma Spring, Putesoy Spring, Burro Spring, Topocoba Spring, High Wall Spring, Habaq Kiielle Spring, Sinyella Spring, Jwa Gwaw Gwa Spring, Baaquithduuva Springs, Qwaq Nonaa Spring, Hmilt Biiwoo Spring, and Willow Spring. Most of these seeps and springs are hydrologically connected to Havasu Creek. These seeps and springs, including Havasu Springs and West Wall Spring, are the source of virtually all the surface water on the reservation.

31. The Redwall-Muav aquifer, also known as the R-aquifer, which is situated in the Redwall and Muav limestone formations, is the primary source of the Havasu Springs, West Wall Spring, and most of the other seeps and springs on Havasupai lands. Most of the spring discharge on Havasupai lands, by volume, comes from the R-aquifer. The R-aquifer is a deep aquifer, located as much as 3,000 feet below the ground surface throughout much of the Coconino Plateau. Approximately 95.4% of the discharge from the R-aquifer occurs within Havasu Canyon, forming Havasu Creek. Approximately 4% of the remaining discharge from the R-aquifer occurs in Grand Canyon National Park, via springs that emerge from the prominent cliffs of the Redwall and Muav formations.

32. Havasu Creek is the sole source of the public water supply in the Village of Supai. Water is pumped from shallow wells in the alluvial groundwater that is hydrologically connected to Havasu Creek. This water is used for drinking water and domestic water needs, such as food preparation, bathing, washing clothes and dishes, flushing toilets, and gardening. The water is also used for the Tribe's health clinic, school, tribal offices, community center, post office, jail, senior citizen center, library, fire station and cultural center/museum. Additionally, this water is used for some tourist

enterprises on the reservation, including a lodge, a café, and various stores and businesses, and it also used for irrigation of the Havasupai's fields and watering livestock, including cattle and horses. Any further development of housing or services by the Tribe would require further development of the water resources of Havasu Creek.

33.     The Tribe also uses its water for cultural and religious purposes. Water is central to the Havasupai's religious practices and traditions, and water is used in all of the Tribe's ceremonies, prayers and medicines. The flow of Havasu Creek is central to the cultural identity of the Havasupai.

34.     The Tribe's water also supports plants, wildlife, and the riparian habitat on Havasupai lands and in the Grand Canyon National Park. Many animals depend upon these waters, including bighorn sheep, elk, birds of prey, and the endangered humpback chub and California condor.

## VI.     THE HAVASUPAI'S WATER RIGHTS

35.     The Tribe possesses aboriginal and federally-reserved water rights to the full flow of Havasu Creek and the springs and seeps on the Havasupai Reservation and in the Havasupai Traditional Use Lands (cumulatively, the "Havasupai Waters").

36.     The Tribe's aboriginal rights derive from the Tribe's historical and continued use and possession of the Havasupai Waters from time immemorial. The Tribe has relied upon the waters in the region, and the plants and wildlife these waters support, for subsistence continually throughout its history. The Tribe's historical uses of these waters include domestic uses, farming, agriculture, raising livestock, fishing, hunting, and religious, traditional, and cultural uses.

37.     The Havasupai Tribe also possesses federally-reserved water rights to the full flow of the Havasupai Waters. Under the *Winters* Doctrine, when Indian

reservations are set aside by treaty, congressional action, or executive order, the United States impliedly reserves water to the extent needed to accomplish the purposes of the reservation. *See Winters v. United States*, 207 U.S. 564, 576-77 (1908).

38. The Tribe's original reservation, established in 1880, was intended to protect the Havasupai homeland, including its waters, from encroachment by mining and homestead claims. Arizona Territorial Governor John C. Fremont recommended the creation of the first reservation in order to avoid the conflicts experienced by the Hualapai tribe, which had resulted in the relocation of the Hualapai to the reservation for the Colorado River Indian Tribes. The original Havasupai reservation protected 38,000 acres, including the springs that feed Havasu Creek.

39. When the Tribe's reservation was surveyed in 1882, the federal surveyor, Lieutenant Carl F. Palfrey, set the southern boundary of the reservation at a point that would protect the main springs that supply Havasu Creek, with the intent of protecting the Tribe's water supply. He set the northern point below the first waterfall (Navajo Falls), thereby protecting all of the farm land within the canyon and the water supply for the farms and the Tribe, although the survey ended up reducing the area of the reservation to only 518.6 acres.

40. Lieutenant Colonel William Redwood Price, who accompanied Lieutenant Palfrey on the surveying expedition, reported to military officials that "our intention was to locate and set aside for [the Havasupai] all of the arable land that they had ever cultivated and to secure for them all the water they had ever used for irrigation." Letter from Lieutenant Colonel, Sixth Cavalry, William R. Price to Assistant Adjutant General, Department of Arizona, Jul 1, 1881. In doing so, they intended to protect these resources from "any encroachment of the whites." *Id.*

41. The 1919 Act establishing the Grand Canyon National Park recognized the Tribe's reservation and also provided a mechanism for tribal members to continue "to use and occupy other tracts of land within [the Grand Canyon National Park] for agricultural purposes." 40 Stat. 1175 (1919).

42. In 1944, through a state-to-federal land exchange, Congress added a non-contiguous parcel of 2,560 acres to the Tribe's reservation that encompassed the Sinyella Springs, which was the only water supply for a significant area of rangeland in the canyon. The purpose of this legislation was to protect the springs for sole use by the Tribe.

43. In the 1975 Grand Canyon Enlargement Act, Congress expanded the reservation to approximately 185,000 acres, which included federal land that had been under the jurisdiction of the National Park Service and within the Kaibab National Forest.

44. The purpose of the 1975 Act, among other things, was "to further protect the outstanding scenic, natural and scientific values of the Grand Canyon." Pub L. No. 93-620, 88 Stat 2089 (1975). Section 2 of the 1975 Act provided that "It is the object of this Act to provide for the recognition by Congress that the entire Grand Canyon, from the mouth of the Paria River to the Grand Wash Cliffs, including tributary side canyons and surrounding plateaus, is a natural feature of national and international significance." 16 U.S.C. § 228a.

45. The expansion of the Tribe's reservation by the 1975 Act was principally intended to protect the Tribe's water resources. The 1975 Act provided that the purpose of the expansion was to "improve the social, cultural, and economic life of its

members." 16 U.S.C. § 228i(a). The 1975 Act also expressly provided that the lands would be used for:

- "traditional purposes, including religious purposes and the gathering of, or hunting for, wild or native foods, materials for paints and medicines,"
- "agricultural and grazing purposes,"
- "residential, educational, and other community purposes,"
- "tribal small business enterprises," and
- recreational purposes.

*Id.* at § 228i(b).

46.     The 1975 Act also provided that the Secretary of the Interior, in consultation with the Tribe, would develop a land use plan (the "Secretarial Land Use Plan") for the use of the lands restored to the Tribe. *Id.* at § 228i(b)(4). In 1982, a Secretarial Land Use Plan was prepared and submitted to Congress, in accordance with the 1975 Act, which included numerous uses of the land that require water, including agriculture, grazing, re-vegetation and restoration of native plants, wildlife management, stock water development, and development of residential areas, schools, health facilities, and tourist facilities. The 1975 Act provided that modifications to the Secretarial Land Use Plan must be made available for public hearing and submitted to Congress. *Id.*

47.     The 1975 Act also contains significant restrictions on use of the lands restored to the Tribe. It prohibits any commercial timber production, commercial mining, mineral production, most commercial development, and industrial development, on the added lands. *Id.* at § 228i(b)(5). The clear intent was to protect and

preserve the natural beauty and ecology of this region, especially as embodied in the flow of Havasu Creek.

48. The 1975 Act provided that "the lands transferred to the tribe *shall remain forever wild* and no uses shall be permitted under the [Secretarial Land Use Plan] *which detract from the existing scenic and natural values of such lands*." *Id*. at § 228i(b)(7) (emphasis added). The 1975 Act also provided that the Secretary of the Interior was responsible for the establishment of conservation measures to protect the lands. *Id*. at § 228i(c). Further, the 1975 Act expressly provided that it did not prohibit Tribal members from accessing "any sacred or religious places or burial grounds, native foods, paints, materials, and medicines located on public lands not otherwise covered in sections 228a to 228j of this title." *Id*.

49. The primary purposes of the reservation, therefore, included: providing a permanent and sustainable home for the Tribe, and its residential, agricultural, municipal and recreational activities; preserving traditional and religious uses of the land; and preservation of the natural aesthetic, recreational and ecological values of the land; all of which necessarily included protection of the scenic and natural values arising from the natural flow of Havasu Creek, and the springs and seeps that feed it. In effect, therefore, while clearly recognizing the Havasupai's longstanding traditional connection to the Havasupai Waters, Congress also charged the Tribe with the duty of protecting these waters as a part of the nation's heritage.

50. Congress impliedly reserved water rights to the Tribe to accomplish all of these purposes. These rights necessarily include the full flow of the waters on the Havasupai Reservation and Traditional Use Lands, as any reduction in these flows would impair the purposes for which the reservation was created.

51. In addition, over 95,000 acres within the Grand Canyon National Park have been designated as a permanent traditional use area of the Havasupai Tribe. 16 U.S.C. § 228i(e). The 1975 Act expressly permits "grazing and other traditional purposes" by the Tribe on these lands. *Id.* The Tribe, therefore, possesses federally-reserved water rights for these purposes as well.

52. The Tribe's priority for its water rights in these waters is time immemorial.

## VII. GROUNDWATER USAGE

53. Defendants are current owners and users of wells that draw from the R-aquifer.

54. Over the past thirty years, increasing numbers of wells have been drilled into the R-aquifer in order to meet the water demands of various surface owners. The Defendants' wells supply water for uranium mines, theme parks, tourist stops, resorts, commercial enterprises, private developments, ranches, municipalities, and others. Mining exploration and commercial development continues in this region, making additional well drilling likely.

55. The Defendants' groundwater withdrawals will reduce the flow of Havasu Springs and the other springs that originate from the R-aquifer, on a gallon-for-gallon basis. Nearly the entire outflow of the R-aquifer occurs on the Havasupai Reservation, in Havasu Canyon, and in Grand Canyon National Park. The Defendants' groundwater withdrawals from the R-aquifer thus directly infringe the Tribe's water rights, and are causing harm and threaten to cause increased harm in the future to the Tribe's right and ability to utilize the Havasupai Waters, and to the traditional, cultural,

natural, ecological and scenic values that attach to those waters, harm that is by its nature irreparable.

56. The Havasupai have never given any of the Defendants any permission or authorization to interfere with the Tribe's water rights through the withdrawal of groundwater.

## FIRST CAUSE OF ACTION

### Trespassory and Unlawful Interference with Water Rights

57. Plaintiffs hereby incorporate by reference all preceding paragraphs.

58. The Havasupai possess aboriginal, historical-use, and federally-reserved water rights to the full flow of Havasu Creek and the springs, seeps, and streams on its reservation and Traditional Use Lands.

59. Defendants' current and future withdrawal of groundwater from the R-aquifer will reduce the flow of the Havasupai's Waters, causing irreparable harm to the Tribe.

60. Defendants' groundwater withdrawals constitute a trespassory and unlawful interference with the Tribe's water rights.

61. Defendants have never received permission or authorization to interfere with the Tribe's water rights through the withdrawal of groundwater.

62. Federal courts have the power to enjoin groundwater pumping in order to protect federally-reserved water rights. *See Cappaert v. United States*, 426 U.S. 128, 133 (1976).

63. Federal courts have the power to grant declaratory relief pursuant to 28 U.S.C. § 2201(a).

**PRAYER FOR RELIEF**

WHEREFORE, the Havasupai respectfully request the following relief:

A. A declaratory judgment that the Tribe has aboriginal and federally-reserved water rights in the full flow of Havasu Creek and the springs, seeps, and streams on its reservation and Traditional Use Lands.

B. A declaratory judgment that Defendants' current and prospective withdrawal of groundwater constitute unlawful interference with the Tribe's water rights.

C. Injunctive relief prohibiting any withdrawal of groundwater in order to prevent any reduction of the flow of the Havasupai Waters, and consequent infringement of the Tribe's rights in such flow.

D. Such further relief as the Court deems just and withdrawal.

Respectfully submitted,

Dated: December 5, 2016

/s/ Richard W. Hughes
Richard W. Hughes
Reed C. Bienvenu
Rothstein Donatelli LLP
P.O. Box 8180; 1215 Paseo de Peralta
Santa Fe, Mexico 87504
Tel.: 505-988-8004
rwhughes@rothsteinlaw.com
rbienvenu@rothsteinlaw.com

Margaret J. Vick
Margaret J. Vick, PLC
140 E. Rio Salado Pkwy #607
Tempe, AZ 85281
Tel: 602-814-7666
margaret.vick@mvicklaw.com

*Attorneys for Plaintiff*